This is the only case that we have set this morning. We typically would limit it to 15 minutes per side, but this is a big case. There are a lot of issues. It's very interesting. Well briefed by both parties, I should add. So we're going to remove any time restrictions. And if you want to go on, just feel free to go on. We'll always make sure that you have five minutes for rebuttal. And if there's a natural time that you want to stop, just go ahead and stop. And if we get tired of listening to you, we'll let you know. The other thing that should be noted for the record is that Justice Kuczynski is ailing and is not able to be with us here today, but she is thoroughly engaged in the battle, so to speak. And we'll listen to the oral, the tape of the orals, and we'll be engaged in the final product that we wind up sending your way. So let's proceed from that basis. Very good. Good morning, Your Honors. May it please the Court, my name is Tom Geselbrot. I represent Fred Eichner, who owns about a half acre tract of land located at the southwest corner of Grand and Jefferson in the city of Chicago. It's next to the Ballmer Chocolate Factory, to its immediate south. To its immediate east is a 34-story residential apartment tower. When was that? Was that in place as of the time that this whole string of events began? Yes, Your Honor. Ballmer Chocolate Factory, which has been there since, I don't know, the 30s or earlier, and the 34-story residential apartment building had been completed, I'm going to say around the turn of the millennium, the turn of the century, something like that. But it had been in place, yes. In light of the fact that the facts here are very detailed, I mean, if handling a case through the trial court and bringing it to the appellate court is sort of like raising a child, we're dealing with a teenager here. We are, indeed. Can you give us a brief outline from the beginning up until the trial and then coming to us of what happened sequentially with how this deal came together from the inception of the TIF to today? From the inception of the TIF to today, it actually goes prior to the TIF, Your Honor. It goes back to the Tribune Company's desire to adopt planned manufacturing district zoning on an area surrounding the building, the printing building, it's called the Freedom Center. Correct. If you may recall, planned manufacturing district zoning was a creation of the city back in, I believe, the 1980s following the Rodriguez decision, which was a zoning case in which the appellate court held that there could be a proper zoning challenge from an increase in the value of property caused by residential properties coming into industrial areas. The city took the position, you can't have that, you can't be harmed by an increase in value. The appellate court said, no, because you have to pay higher taxes and it might force you out. In any event, the city, through Mayor Daley, then adopted what's called planned manufacturing district zoning. It's a special zoning category, and the fact is that there has not yet been an instance in which planned manufactured district zoning has been changed from industrial to residential. There's nothing in the ordinance that forbids it, but that's a simple fact. And that was a testimony to the trial. Yes, Your Honor. I think that's undisputed. Everybody agrees with that. The Tribune Company decided that they wanted planned manufacturing district to cover the Freedom Center. A proposed district was created, it went to a public hearing, and it would have extended to the Blommer Chocolate Factory, which is approximately two or three blocks to the south. All right, so it would go south across Grand Avenue up to Kinsey, which would be the southern border of where the chocolate factory is? Correct. Was that southern border always part of the planned PMD? Yes and no, and let me tell you why I say that. It was planned to go down to Kinsey, and then there's another development called K Station, which was planned south of Kinsey. People from Blommer Chocolate, and this is all evidence in the record, people from Blommer Chocolate said, look, we don't want to be stuck with planned manufactured district zoning because we're afraid that when the K Station development is completed, when the residences are completed, they're not going to like the smell of chocolate. Some people don't. And we're concerned that at some point in time, we will be forced to leave. And when we leave, we want to be able to sell our property for the highest and best use. When was that taking place? What you just described took place in 2000. Roughly 2000. It was after the PMD had already been proposed, well, proposed, they had already done a study. They had done a study? I mean, everything with the city had started well before that and started to look at this and do a very deep and intense study of the whole situation, which is required under the law. The city had not. It had actually been paid for by the Tribune Company. But regardless, yes, there was a study. But what happened was when Blumberg Chocolate came forth at that public hearing and said, you know, we object to this. That's when, well, I won't use a profanity, Your Honor, but a lot of things happened. Things get profound. Thank you. And at that point, there was intense negotiations between the city and Blumberg Chocolate. Essentially, I think this is a fair inference from the evidence, politically, the planned manufacturing district was not going to fly with the opposition of Blumberg Chocolate. And the city, and I think this is reflected in the evidence as well, required the support of Blumberg Chocolate in order to proceed. Where do you have that in the record? That's from the testimony of, I'm sorry, that's from the letters that come back and forth from the planning commissioner to Blumberg Chocolate. And the alderman, the terrorist, was also quoted as saying, I won't let you leave. I won't let Blumberg's leave. That's what the alderman and the terrorist said. Very eloquent. But I want to go back to my first question that we were talking about the boundaries of this, because one would think that the boundary of it could end at Grand Avenue, but in fact, it went across Grand and went up to Kinsey, which is interesting in light of the fact that right across the street from Kinsey, you've now got that big tower there and you've got K2 over there. So the question I asked was, was the southern boundary from the beginning, given that the recommendation stage in November of 2000 when it was recommended and when it was approved a few months later, January 10, 2001, did it always go all the way out to Kinsey? It always went all the way to Kinsey. The explanation for it, and you're at the edge of my memory, Your Honor, so bear with me. I believe the explanation, I believe the question was asked, why go to Kinsey, why not stop at Grand? It was a discussion of a viaduct stopping, which was the other side as well. Something about that, I'm prejudiced, it did not seem like a very cogent reason to go all the way down there. Nevertheless, from a political perspective, it appeared that unless they could get the support of Blommer Chocolate, they were not going to go through with the PMD zoning. And that then gave rise to the series of negotiations between Blommer Chocolate and the city, which eventually resulted in a deal by which Blommer Chocolate would receive, round figure, $20 million in TIF subsidies, because as part of this whole project, there was also the River West Tax Income and Financing District Plan and Redevelopment Project. It's all part of the same thing. But it wasn't discussed until after the PMD had already been in progress, at the time line. Your Honor, I would disagree with you, there's a statement from a member of the planning department that explicitly tied the PMD and the TIF plan together. A statement. Okay, so one little statement, but where, was that made public? Yes, that was at one of the public hearings. Absolutely. Okay, a public hearing prior to the city council's approval on January 10th, 2001? Correct. Okay. Correct. Okay. And at that, so I'm on subject here, at that approval by the city council on 1-10-0-1, it was determined that this was necessary to preserve this as a conservation area, right? Conservation area, that's the River West TIF plan. Okay. How do you square that then, counsel, with the fact that the city council, in June of 2002, when they authorized this eminent domain action against your client, did so, according to the record, saying that it was necessary to improve, quote, commercially, a commercially blighted area. How do we... I don't think you can. I don't think you can. There's no evidence to suggest that it was blighted, the city council never made a determination that it was blighted. It doesn't have to be blighted, does it? In order to give the property to Blumberg Chocolate and take it from... It could be, in the future, it could become blighted, the fact is, under the act... I disagree, your honor, let me tell you why. I disagree because, while eminent domain is authorized in a conservation area under the act, the taking of private property to give it to a private individual, where it is not by the constitution, so regardless of the act, the constitution bars it, that's the Suida case. No, that's not the Suida case. We'll get there, we'll get there. But your support for that is both the constitution itself and the Suida decision, which we'll get to in a little bit. Correct. Okay, so before we get to the case law on, you know, Suida and the snow thing... I'm blighted, I just had a question, I'm blighted. Gutnick says that it's okay to prevent potential future blight or eliminate already existing blight. Do you agree with that? I agree with that, that's what Gutnick says. So we don't have to wait for blight in order to prevent it, and that's what they were going to do here. If Gutnick were still good law, I would say you're correct. I do not believe it is good law after Suida. Gutnick was argued by the agency in that case, and it was cited by Justice Freeman in dissent as saying that it was okay to do what they were doing in Suida. The majority rejected that. They didn't reject it explicitly, but clearly they rejected that outcome. So I don't think Gutnick, Gutnick, Howard, Brown said... But it hasn't been, there's no decision by the Illinois Supreme Court rejecting it. That is correct. That is good law. This case, this case puts it to the test, Your Honor. This case puts it to the test. So you want us to overrule Gutnick with the Supreme Court? No, I don't want you to overrule Gutnick. My point would be that that dicta in Gutnick, the dicta in Gutnick that says we can use eminent domain to prevent future blight, cannot survive the Suida case. Suida is on point... You want us to say that Suida is the controlling precedent and that we follow that regardless of what the Smelting case and the other cases after it have said, right? Absolutely. I'll deal with Midland Smelting when you want me to, that's got nothing to do with it. Gutnick poses the issue that Judge Novak identified in 2006 or 2007 when she certified this issue for appeal. What year was Good Connect? 1954.  1954. It's only slightly younger than me, Your Honor. That's why I uttered my first breath. There you go. I thought it looked as old as you. So, I'll just get to our timeline and we'll get into the law in some great detail. Sure. Once the issue with Blumberg Chocolate was identified, the evidence shows a series of discussions with the city which culminated in the agreement. The agreement was first documented, if you will, in the letters from the Planning Commissioner which indicated, we will acquire the Eichner property and two others in return for your public support for the PMD ordinance and that's what happened. They dropped their objection, right? They dropped their objection at the same public hearing that Mr. Eichner asserted his objection to the taking as well as one of the other property owners asserted his objection to the taking. Blumberg Chocolate said, no, we support the PMD, we've got a good deal. Let's proceed. Roughly, how many property owners are we talking about in this whole PMD? In the PMD... You know, the places that are north of the Tribune and... Mr. Asaro would probably know this better than I do. Probably less than a dozen. I know the Tribune Company, Water Saver Faucet, and then south of Grand, there's a few... The only two... A small number. The only two that objected were Eichner and Blumbers and Blumbers ultimately was persuaded to drop their objection and in exchange they got the Eichner property. There was a third objector. Who was that? I forget the name, but there are three properties that are to be acquired pursuant to the Blumber redevelopment agreement. Eichner was one. This objector was one of the other two. Was that also a property that was south of Grand? Yes. Okay. So that's something else that Blumber got. Yes. Pursuant to the redevelopment agreement, the redevelopment agreement is kind of strangely drafted, so the property, for example, the Eichner property has not yet been conveyed to Blumber Chocolate pending disposition of this case and they don't have to actually make a decision as to whether to take it until after the property is put to them, but the principle remains the same. Did that entity specifically draft its objection? Did it agree on a price or what happened? It eventually went to eminent domain and I believe that was resolved. I am not 100% certain on that. Is your position that the conservation district was driven to get the land for Blumber? Are you suggesting the primary purpose or sole purpose as Judge Novak? Will you tell me what your position is? Look, I would agree that there is not evidence of primary purpose or sole purpose, unlike some of the cases that we cited in our brief where that was the primary purpose driving the rezoning, but I don't think that's the test. I think as long as there is a proximate cause between the two aspects of the project, the depreciation in value caused by one aspect, i.e., the prime manufacturing district, causes a depreciation in value, that's barred by the statute, by the Illinois Project Influence Rule. So, yeah, I would agree with you that there was not a sole purpose or a primary purpose, but I think Judge Novak erred in making that the test because that's not the statutory test. Let's go back to our timeline here. When, during this series of events, did Blumber's attempt to buy the property from Mr. Eichner for something under $900,000? There was a statute, there was an offer made prior to the jurisdictional eminent domain offer. Is that a necessary thing in these sorts of cases? The jurisdictional offer is the private attempt to acquire is not, however, the testimony was that the offer was made by Blumber's because, quote, that's the way the city wanted it to go. Okay. So, yeah. That's what was going on. All right. The deal was reached, Blumber removed its objection, the planned manufacturing district zoning was adopted, subsequently the city council moved forward on the eminent domain acquisition. That's in June of 2002, right? I believe that's correct, Your Honor, and there was a delay in terms of actually filing the eminent domain case until, I believe, 2005. I think glaciers are disappearing during the pendency of all this. This case has taken a long time, Your Honor. I don't, you know, I was wondering before I got up here, you know, what if they asked me how long it's taken and, hey, it's taken a long time. I don't think anybody is particularly to blame in that regard. The property is vacant. We're not complaining about the length of time. The land is still the same now as it was before. Somebody said, God's not making any more of it. It hasn't been converted into this new use, which is going to be what, landscaping and parking? Employee parking is what it shows on the plan. No, it is not. It's still... But there's, again, this is just a half acre of a much, four and a half acres that they're... Roughly four and a half acre campus. As I put in the brief, there's a lot of consolidation that went into the whole Blommer project, include vacating streets, et cetera, et cetera. This property is on the extreme north end of what will be the Blommer Industrial Campus, and the only use that's designated is employee parking. Now, the size of it, 25,000 some square feet, you've made mention of the tower that's across the street on Jefferson, on the south side of Grand. Is the land owned by Eichner something that would accommodate a building like that? The short answer is yes. The somewhat longer answer is I'm not sure if that's actually in the record, but certainly one of the things that I asked my planner to do was to tell me if the footprint for that building would fit on the Eichner site, and the answer is yes. What is it, like 30 stories? 34. Okay. Residential tower. All right. So, moving forward then, there's a complaint to condemn in August of 2005, and then you file this term in your target of eminent domain law, traverse? Traverse. Traverse. Traverse, your honor. All right. Tell us what a traverse is. Okay. Eminent domain is, according to the case law, sui generis, and the exact applicability of the Code of Civil Procedure is a little unclear. Under the case law, a traverse is a responsive pleading filed by a defendant which puts to the test the authority and necessity of the taking by the condemning body. The case law is pretty clear that you don't have to have much to a traverse. There's actually one case where a defendant scrawled on crayon, I object, and the appellate court said that was sufficient for a traverse. You did a little bit more than that, though. We did a little bit more than that. It's sort of like a motion to dismiss? It is, but here's an important distinction. On a motion to dismiss, the movement bears the burden. On a traverse, it's the city, the condemning body, that bears the burden. Which judge ruled on it, and what was the ruling? We know what the ruling was, but which judge ruled on it? It was Judge Rita Novak. Judge Novak, we had a nice, a couple of things. One, the facts aren't disputed with respect to the traverse. We didn't have to have a hearing. You can have an evidentiary hearing on a traverse. We didn't really need to hear, because everybody knows why it's being taken, who it's being taken for, et cetera, et cetera, et cetera. So we heard it, had an argument. Judge Novak wrote a decision, which is in our brief, which I disagree with. There was a motion to reconsider. She denied it. There was a motion to certify for interlocutory appeal. She granted it. She defined the issue, which I would accept as the issue on this point. This court said no? This court said no. So you go back, and then you have your trial? We go back, and that takes us to about 2008, I want to say. It took us a while to get things together, various... So all the way up until 13, when you have the trial? Correct. What's happening? I know you're not blaming either side for it, but give us just some sense of what was going on. Pulling together evidence, looking at comparable sales, getting witnesses, expert witnesses lined up, prepared, deposed. Took a long time, Judge. Well, this is an expert witness case. This is an expert witness case. There's no question about that. In addition, there was another long extent of briefing, and that was my motion on behalf of the defendant to bar the PMD zoning, Motion to Eliminate. And that we pulled together an awful lot of documentary exhibits, etc. The city had to respond to that. They filed a bunch of stuff. Okay, and the basis for it, how would you articulate it, and then tell us what the court did and why you disagreed with it? I would articulate it as the fact that the PMD zoning is barred by the Project Influence Rule. Project Influence Rule basically says, it's a common-sense approach, if the project causes an impact on value, you can't consider that impact on value. When valuing property for eminent domain purposes, you look at it with blinders on, ignoring the project for which it is taken. Is that strictly from a statutory basis, or is there case law on that rule that you cited with the judge below and would correct us to? Both. There's both case law and there's the statutory mandate. The case law probably came first, then the statute codified what the rule was. The Project Influence Rule is common in virtually every eminent domain jurisdiction. What's the leading case on it, subsequent to the writing of the statute that you would cite in support of? I think probably the Exchange National Bank case. That's the one that the California courts have used, have cited as a good example of the Project Influence Rule. Can you explain why you believe that that rule applies here? Number one, because as I think Mr. Larson from Blumberg Chocolate testified, this whole factual situation was part of a unified comprehensive solution, a win-win-win that solved everybody's problems. Except for one. And the other people that we're talking about. You're taking a particular point in time. When you say that, it says starting at the beginning. You're starting way down the road and saying, we're going to start our discussion at the Blumberg getting involved, rather than looking at the whole total, going back in time and looking at the fullness of the record and what is occurring here and what the city is trying to do here. Isn't that what we should be looking at? Sure. Does that apply here? That's my question. Ultimately, my question is that I'm asking how it would be applicable to this particular rule. Sure, Judge. The first thing you have to do when applying the Project Influence Rule is figuring out is this one project? And here I quote the city, quote, the taking of IPM's property is part of a larger effort to maintain and encourage manufacturing within the city through the River West TIF plan and project MPMD number five. That's not me. That's the city. So that kind of defines everything as one linked set of facts. That's what I use to say that it's all together. And that's not me. That's the city. So because of that, and then the test that we've gotten in the statute actually comes from the United States Supreme Court case of U.S. versus Miller to determine whether there is, in fact, a separate project. In the statute, the statutory exception in 735 ILCS 30-10-5-60 says such appreciation or depreciation shall not be excluded when property is condemned for a separate project conceived independently of subsequent to. This was all part of the same thing. I mean, looking at Miller, I mean, that property, everything was all in the PMD. I mean, I don't see how you could say it's separate. Looking at Miller, it seems to me Miller is saying this is all one, one plan. I agree. What I'm saying is that the statutory exception defines the scope of the rule. In other words, if you have a separate project conceived independently, the project influence rule doesn't apply. In Miller, it was one dam and then a separate taking for something different. And this, we're talking about just one entire project. We're talking about one entire set of facts. So that the language that you are referring to from the statute that would impute or imply or require the project influence rule is where it says such appreciation or depreciation shall not be excluded when the property is condemned for a separate project. And this is the opposite of that. That's actually the language that defines the scope. Slightly ahead of that in the statute, Your Honor, which I have a copy of, it states, quote, in the condemnation of property for a public improvement, there shall be excluded from the fair cash market value of the property any appreciation in value approximately caused by the improvement in any depreciation in value approximately. Language right above that. Right above that. And so that's the meat of the project influence rule. The next sentence kind of defines what the scope of the project is for those purposes. So for that reason, Justice Hyman, that's why I think the project influence rule applies. And that's what we argued. Judge Novak said no. And I think she erred in that regard. Is that separate? And this probably sounds simplistic to a sophisticated practitioner. But is that separate from the denial of your traverse? Yes. Okay. So that gets into what kind of evidence is going to be heard at the trial involving the condemnation. Right. As far as I'm concerned, if you rule on issue one for me, we're done. Okay. And had Justice Novak ruled for me back in 2000, whatever it was, seven or eight, we should have been done at that point in time. It was only after that this court said, no, we're not going to consider the issue yet. Go back and try the case. Then we had to start thinking about it. So you're back for there to be a retrial? I'm sorry? There to be a retrial because of her ruling or? If you were to say that she was correct in denying the traverse, if you were to find some kind of a public use here, then and you were to reverse on the project influence rule, yes, there would have to be a new trial. I don't think you should. No, understood. It can be broken down in that way. We can analyze it first as to whether or not the taking was appropriate under the Constitution and the relevant case law, slida, etc. And if we decided to go against you on that, then we visit the separate issue of whether or not the trial itself was fair and if there's enough of a basis to remand it for a new trial. Is that fair to say? That's very fair to say. Very fair to say. The second aspect, kind of the reverse aspect of the project influence rule and the planned manufacturing district zoning is then Judge Brennan's ruling, I'm not going to say the eve of trial, but right before trial commenced, that basically barred defendant from showing the facts and history leading up to the adoption of the PMD zoning to show that it indeed was an ad hoc zoning decision to serve the interests of Blumberg Chocolate Company and the Tribune Company rather than some kind of careful, objective, neutral planning decision. Downzoning is it? Downzoning? Well, it was a downzoning. You know, there are some downzonings that are perfectly proper. I would concede that. Some are. This one wasn't. And the fact, it's not that it wasn't proper. This is not a collateral attack on downzoning. This is an attempt to tell the jury, hey. Putting it in context. Put this in context. And one of the charges to the jury is to determine value by virtue of the highest and best use of the property. And highest and best use means whether the property is zoned as it is or some other designation for which it is reasonably probable. Okay. How does the motion and getting in all of the intrigue, if you will, or the background of this square with the city's decision shortly before trial that it was going to get into evidence of what the value would be if the zoning was changed? Well, I'm trying to figure that one out. I'm not sure that I can explain the tactical decisions of the city. You can try to bug your colleague about that. You certainly could. The simple fact from a factual perspective is that the city had originally had two appraisers, Ms. Dart and Mr. Gibbons. And they both had opinions of value of approximately a million five, a million six, with the highest and best use of simply industrial, saying that there's no reasonable probability of rezoning under any circumstances. Right before trial, they said, well, no, we're going to get into it, but we're going to do it by grabbing one of your guys. They grabbed Maroos, right? They actually grabbed two of my guys, although I had disavowed them. Maroos and Suvinole, or? Maroos and Suvinole. We had abandoned, if you will, them as witnesses. A lot of this had to do with the availability of the missing witness instruction. Okay.  If the defendant calls Mr. Klozinski at $5 million, but doesn't call Maroos and Suvinole at three and a half, then you should bear an adverse inference. We didn't get into that because I formally abandoned Maroos and Suvinole. Which opened the door for them to be able to? Well, it didn't open the door. The door was always open for them to designate them. That's Meehl versus Numagata. You prevented the adverse inference from the 501 from being used by? It was actually after Judge Brennan ruled on the missing witness instruction that all of this happened. Okay. Because the missing witness instruction shouldn't be given in that instance for the reasons that I cite in my brief. So she was correct in that the consequence of that was this tactical interplay of who was going to call whom, which we've asserted as error for the reasons that I said. Maroos comes in and on direct examination gives a value that winds up being really, really close to what the jury ultimately comes up with, right? Two percent. Yeah, it's like 2.55, jury comes back with 2.5. Correct. And you would argue that they were, therefore, heavily influenced by the fact that Maroos' opinion, 2.5 is a good one, and it just so happened that they get into the fact that Eichner was the one who retained them. I think the facts speak for themselves in that regard, Judge. But what's important, a couple of other things are important about Mr. Maroos. Number one, he never should have been allowed to testify for the reasons that we say. But number two, when the city... I assume we don't agree with you on that. Right, right. What should have happened on cross-examination? What should have happened on cross-examination is defendants should have been allowed to say to Mr. Maroos, Mr. Maroos, you put forth on direct examination an opinion of $2,550,000 under a, quote, extraordinary assumption. Yes. What do you mean by extraordinary? And he would explain it. Now, do you have an opinion of value without the extraordinary assumption? Yes, I do. And your position is that that would, forgetting about whether or not it's within or outside of the scope of examination, that it would impeach his testimony that the value was only X because he doesn't believe that that assumption is correct. Correct. His opinion of value, which the jury heard, is not his opinion of value. It's his opinion of value in an artificially constrained universe of no reasonable probability of rezoning. I know that because I asked him to do it. Because you didn't have to witness a hypothetical question, which is what it was done, even though he disagreed with the basis for the hypothetical. Exactly. When I instructed Mr. Maroos, I said, look, Mr. Maroos, give me two opinions. Give me your real opinion, and then if the judge says we can't go into reasonable probability of rezoning, I want a backup. I want to know what your backup opinion is. Fine. He did. The city used the backup, but not his full story. Okay. What about the, here, I'm sorry. What particular case would you rely on for the proposition that you should have been able to? I think, again, Neal versus Nimigata. I think there's a couple of other sites. It's within the confines of this type of litigation more than anything else that opens it up? No, I mean, I think this is cross-examination of any expert. I mean, what did they used to say in Bar Review? You can cross-examine an expert with a bowl of spaghetti or linguine or something like that? And that was what your leader of Mountain Dew did at a malpractice trial. There you go. But in this case, and the city quoted, cited, I think it's the Merton Realty case, where they were not allowed to, where the cross-examiner was not allowed to bring up an opinion on a different piece of property. Okay, I can understand that, but this is the subject property. I think you ought to be able to get into that with the expert witness. So you would suggest that because it is the subject property that it's the furthest thing from harmless error? Yes, absolutely. And you would back that up by pointing out the coincidence that the jury came back with almost the exact number that the person you retained had come up with on the low end? Striking coincidence. And was barred from bringing out the high end? Striking coincidence, Your Honor. His opinion on the high end was what, 3-6? The guy you put on Suvinole was 5-1, I think? 5-1. I don't recall. 3,560,000 was Marouse. That was his real opinion, yes. Before we go on, let's go back to the zoning issue. Sure. And as my understanding, the evidence shows that the city always intended that Agnes property be part of the PMD. So it wasn't like they created, you know, something that came up later on. I mean, it was always going to be part of that zoning. That meant they didn't particularly do all this because of him. He wasn't driving this. This was driven because of very other public reasons that the city wanted to have this. Right, he wasn't driving this. The Tribune Company was driving this. But what I would say to you, Justice Hyman, is while Eichner's property was always within the confines of the PMD, the PMD would not have happened, would not have been created, but for the taking of Eichner's property to support of Blomer Chocolate. That's the evidence. So that was created years before the condemnation occurred. You're talking five years later. That's correct on timing. But the letter from, I believe it's Commissioner Hill, was explicit. The city would acquire the property, but the quid pro quo was Blomer Chocolate's support for the PMD zoning. So they're tied together even though they're separated in time. It took time for that to happen. Correct, but it did happen. There's a political agreement that we're not going to object, we're not going to make you go through hearings and lawsuits and everything else. But that still doesn't eliminate the fact that the whole purpose, there's a public, the reasons that the city did all this are legitimate. I don't see anything in the records that they had no legitimate basis to do this. Well, why don't we get into that? That's a good jumping point, I think, to get into the swide of whether or not the overall taking was appropriate. So I think that's what you're. Let me do two things. First, let me respond to your question. I don't think at this point with respect to the zoning, we're not challenging the legitimacy of the zoning. It is properly enacted zoning. I will concede that. Why it's important, why the history is important is to show the jury that it is not reasonably probable that it would stay in place. If you had objectively adopted zoning pursuant to careful planning principles, which is what the city's planning expert tried to testify to, tried to say, then the jury might come to the conclusion that, well, there's no reasonable probability it's ever going to be opposed or ever going to be changed. Here, the history is different. Here is an ad hoc response. Ad hoc deal to favor a preferred developer. And I think the jury was entitled to use its common sense to say, okay, I understand what's going on here. If indeed we had a neutral, objective, impartial, and dispassionate zoning authority, then there would be a reasonable probability of rezoning. Is there a separate evidentiary argument from the project influence rule? Or is it sort of tied in together? It's tied together. It's the corollary or the follow-on to the project influence rule. Never should have gotten there because of the project influence rule, but once you let the PMD zoning in, you got to let in the whole story. And you have to let in the whole context for how all this happened. Yes, Your Honor. But then you're kind of forgetting the whole reason the city went into this. I mean, we can say it's there in the Tribune, whatever. The fact is, it was good for the city. The city had many other PMDs, other TIFs. I mean, the whole idea was the city had a big plan. They keep manufacturing the city in certain areas, residential in certain areas, and no PMD has ever been a residential project. All these things come together. And it seems that what you're suggesting is that the whole deal was put together just to satisfy blunders and ignore everything that transpired before. Judge, what you just summarized was what the jury should have heard from the city at the same time that it heard from me the counter-argument, and then the jury would decide. But that's not an issue for the jury. The issue for the jury is the issue of the value of the property. The fact is, if the city has, I mean, I'm not saying that's the better position, but if the city has a good basis to go ahead with the condemnation, that's fine. Then there's no reason, and under the case laws I understand it, that the jury should hear about that. The issue is valuation. No, the issue is valuation, but that's part of valuation, because that is the issue that goes to reasonable probability of rezoning. The jury has to make a determination, and they're instructed. In this case, that was a jury issue to decide whether it is reasonably probable to change the zoning, and thereby get into higher value. And you see in the summary of that. That's specifically a factual issue for the jury to determine. Absolutely. They're instructed on it, and they were instructed in this case. So, and again, Judge, it's not a question of legitimacy. It's not a question of a collateral attack on the constitutionality of the zoning. It goes to the reasonable probability of rezoning. And that is a jury question. The reasonable probability. Correct. Okay, so that's that point. Now let me turn to SWEDA. It's sort of the overall constitutionality of the taking and the case law related to that. Right. Tell us about SWEDA, KELO, and, you know, why you should prevail. One of my friends, Mr. Redmond, he and I have talked about this publicly on a number of occasions, and he always pulls out the People Magazine article that had Suzette KELO on the picture. And he says, this is the only case where we eminent domain lawyers get to, you know, get popular things, because everybody knows about this. Everybody knows about the KELO case. SWEDA was one of the triggers to the KELO case. And I could give you the history of this that goes back to the 1990s that brought us up to SWEDA. But what happened in SWEDA was the Illinois Supreme Court was presented with a taking of non-blighted property. The taking from National City Environmental to give it to the racetrack so that the racetrack could get street-level parking so that it could qualify for NASCAR races. That's what it was all about. The governmental entity, the thing that seems to have animated the Supreme Court's decision, and it's funny how it got there, but the thing that seems to have animated the Supreme Court's decision in that case was that the governmental entity was looking for money. I mean, they were brokering the deal, right? Are you comparing that to what the city did in this project? No, no. And I think that's, if it's not, then how, why should we be constrained by the precedent of SWEDA if the conduct, because these are so factually, you know, determined. The court went to great lengths to say that this, you know, this difference still exists and this is factually based, and in this case, the entity was acting as a broker looking for money, advertising. But I disagree with that, Your Honor, that that is the animating factor to the SWEDA decision. The Southwest Illinois Development Authority was created back in the 1990s by statute, specifically to increase economic development in Madison and St. Clair Counties. A very laudable public goal, I will admit. Just as stimulating economic development in the city of Chicago is a very laudable goal. Now, in the SWEDA case, they were looking for development. They were looking for people that would bring money to Madison and St. Clair Counties and that they said that they were willing to use their eminent domain powers, which by statute they have, to assist those efforts. But that is not the all fours of the SWEDA case. The Illinois Supreme Court did not say you can't act as a broker using your eminent domain powers. That's not the holding. The holding is that public purpose does not equal public use. And that is a debate that goes all the way back to Berman versus Parker in the United States Supreme Court. And the Illinois Supreme Court came to a different conclusion. Justice Freeman, in dissent, is correct. It is very hard to square Berman versus Parker, Hawaii Midkiff, with the majority's holding in SWEDA. Other than to say, as Kelo eventually did, that the states can have stricter rules than the federal constitution requires. So your position would be that the takings clause in the Illinois constitutional sense is different from that of the US, and therefore we're not obliged to follow Kelo. Correct. And that's what Kelo said. Justice Stephen said in Kelo, states are free to make their own. And that's why SWEDA is still very good law. Takings must, or the power of eminent domain, must be exercised with restraint, not with abandon. The public purpose is like public use, but you can't conflate the two. If it's still very good law, and I'm not saying that it isn't, but let's just argue it out here. If it is still very good law, can you cite to us any cases that have used it favorably as precedent? The only one that would come close is the, and I'm going to pronounce this incorrectly, the al-Muharrajim case, which coincidentally also came out from the Fifth District. It was after the appellate court decision, but before the Supreme Court's decision. Is that cited in your brief? It is. And that's the case in which the appellate court acknowledged its own rule, which the Supreme Court later affirmed, but said the blight exception occurred there because the particular mosque was, it's a litany of bad conditions constituting urban blight, totally dilapidated urban ruin and decay, that kind of stuff. But in terms of actually saying, here's a case in which there is property that is not blighted or a slum, and therefore you can't take the property, citing Sweden, that's this case. This would be it. This is that case. I don't see, where does Sweden say anything about blighted, you can't take it if it's blighted? It says, no, it doesn't say you can't take it if it's blighted. It says that it is a proper public use to acquire blighted or slummed property, and then give it to a private property owner. But that's not, they're not limiting, those are just two examples. I don't see that as a limitation at all. I don't see it as a limitation, I see it as an exception to the rule of Sweden, which is that you can't take private property from one... I don't see where you get there from Sweden. That's not what Sweden was talking about. In Sweden, what you have is you have the difference between the means and the results. I mean, they have very good reasons, as you said before, for what they were created to do. But along the way, they lost their direction and they started putting their hands out and say, you pay us and we'll help you get things done. That's what this court found to be wrong. I disagree with you, Jesse. They did not say that. They did not say in the Sweden decision, what's wrong here is the state is acting as a broker. They said what's wrong here is that there is no public use, and that there has to be a public use. And to say that the public use was that there would be less traffic or it's easier to park to get to the racetrack, that wasn't going to cut it. That wasn't going to cut it, and they looked to see who was the primary beneficiary of the taking. Not some incidental beneficiary, but the primary beneficiary, and in that case it was the racetrack owner, and in this case it's Walmart chocolate. No, but that's not exactly what the court said. To quote the quote, let's use their words. It said, to advertise that for a fee it would condemn land at the request of private developers for the private use of developers exceeded the state and federal constitutions. That's a whole different problem than what we have here. I don't think you can equate the two. And so this is specifically tying in private developers, which we don't have here. In the beginning, this was a public project. It began with a PMA. It had nothing to do with Eichner, nothing to do with bloomers. This, it seems, was something good for the city. And here it's private developers using for private use. Judge, respectfully, I can't agree with you on that. I agree that it may have started without the specter of private benefit, but it certainly got there. And I disagree that there are no private developers here. This Walmart chocolate company is a totally for-profit private entity. They're the ones that are the primary beneficiary of this taking. You've got $20 million and a piece of land that they've offered 900 that the jury valued at 2.5. They got it for a buck, right? Correct. So respectfully, Your Honor, I disagree. It is an undeniable aspect of the case, and the Supreme Court did not look kindly on it, but I don't believe that's the holding of the case. The holding is that you cannot take from A to give to B. There's no public use. That's the key. You just said it. There was a public use. We can go through all the things that this did for the city, and that's the difference. There is definitely public use. This is bringing in tax money. This is helping residential developments on the other side. This is helping more manufacturers stay in the city. This is going to build a city center for commercial use. And that is conflating the differing concepts of public purpose and public use. Yes, there's a public purpose for this. Absolutely. The city could have spent money. It's not Millennium Park. The public isn't using it. That's correct. They don't have to. It's been traditional. I think you're saying public use, and the public's not going to use this parking lot. Your Honor, I think you look to the Friends of the Earth, Friends of the Park case, the Soldier Field case, because that's what Justice Freeman said in that case. He said, if you can spend public money to support the McCaskey family, he didn't say this, but we all knew what was going on, then you can do anything in the name of public purpose. And because of that, Sweden's requirement of public use must be a dead letter. So show me where in that opinion, read me the words where it says that specific, as you articulated. I believe it's quoted in my brief, Your Honor, and I apologize. I don't have a Friends of the Park decision there or with me. Hold on just a half a second. 15 and 16. Correct. On page 15 and 16 of my brief, Justice Freeman, in his dissent, thinking that Friends of the Park necessarily overruled Sweden, quote, by withholding the majority recognizes what it refused to acknowledge in Southwestern Illinois Development Authority, it only remains for this court to explicitly overrule the public entitlement requirement advanced in Southwestern Illinois Development Authority. So there's where the public purpose, public use distinction becomes open. It's not a hold-in. Justice Lavin, you were asking me about was there any subsequent case. Well, this isn't an eminent domain case. But it certainly illustrates where the position of the Illinois Supreme Court is. And the majority in Friends of the Park specifically says, no, Sweden is different because that's an eminent domain case. This is just an expenditure of public funds case. Public purpose is all you need for expenditure of public funds. Public use is what you need for eminent domain. And, you know, another question I thought you might ask me is, well, how much public use is enough? And that's a very interesting question. It plagued the justices in the oral argument in the Kelo case. You don't have to answer it here because the simple fact is there is no public use when you give the property to Blender Chocolate. Because it's an employee parking, right? And they're going to create some sort of landscaping buffer, right? You know, there's nothing in the redevelopment agreement that binds it to being employee parking or anything else. It becomes Blender Chocolate's fee simple ownership to use as they like. That is not, respectfully, a public use. And whatever the boundaries of public use may be, we're way beyond the pale. Okay. Let's move on. One last point, if I could. Just one last point. And maybe I'm repeating myself, Justice Hyman, but I want to go back to Guttnacht. Because Guttnacht would authorize this as prevention of future blight. And I can reiterate, the only other case that I'm aware of that has addressed that issue is the 99 cents only store out of Lancaster, California, which we cited in our brief. And that was just rejected. And it's rejected because it's common sense. Because if you can't use eminent domain in the name of economic development, preventing future blight is nothing more than economic development by another name. So if you allow Guttnacht to be an exception to SWEDA, it would swallow the SWEDA rule completely. Is there a case in Illinois that says that Kelo is not binding authority? No. Okay. No. That would potentially be this. That would be this, yeah. Okay. Yeah. Let's then get to. Let me just make sure I understand. You're saying it's, or maybe you're not. Possessory use by the public, you're saying, is indispensable, prerequisite. Boy, it sure looks like that's what the SWEDA case says. That's what you're saying. That's how I read SWEDA. Now, how much possessory use? Museums in the park have to be open to the public for, what is it, 15 days a year, something like that. So I don't know what the exact boundaries are, Your Honor. But whatever the boundaries are, we're way beyond it. So if the law says that's that. So it felt like if not an indispensable prerequisite, then you would lose. Reach down there. I think I see where you're going, and I think I would probably reluctantly tend to agree with you. The reason I wouldn't think you could get there is because that would equate public use and public purpose. And the Illinois Supreme Court. That's still a valid distinction. Yeah, you can't equate them. Right, you can't equate them. And that's what the federal courts have done. If you look at the Connecticut Supreme Court decision in Kelo, which the city urges you to do, the Connecticut Supreme Court decision equates public purpose and public use. So they're synonymous. They're synonymous. They're the same thing. And acknowledges that the Illinois rule is different. Okay. Now, let's briefly, if you could, address the Midland smelting and the substitute condemnation. Yeah, Midland smelting is completely different. Midland smelting was a substitute condemnation case. And substitute condemnation occurs when, if I take property from you, Justice Hyman, because of a proper public project, say a highway, and Justice Lavin, you've got a piece of property that Justice Hyman wants, I acquire Justice Lavin's piece of property and I give it to Justice Hyman. And that's called substitute condemnation, and that's what happened in Midland smelting. And the court in Midland smelting said, well, this isn't like Sweden at all because this is substitute condemnation and Sweden wasn't substitute condemnation. So it's just apples and oranges. You can't use Midland smelting to in any way justify a retrenchment from Sweden. In addition, the statement, as the city argues, that takings to eliminate blight pass constitutional muster, which is what the court said in Midland smelting, I completely agree. Right. But this isn't blight. What is interesting in Midland smelting is that you focus on the motives. Excuse me. Is the primary intended beneficiary of the taking the public or private person? Here it's Palmer. It's Palmer Chocolate. All right. Well, here's where I want to ask. Because it seems to me that most projects, such as this one, have both. So this isn't a pure private-private. What you're doing, again, is saying, let's look at this one half acre on this 42 acre or whatever it is plan. And, you know, everything goes right down to this. This is all done for that. That's where you go to Sweden. Sweden was all down to what the racetrack was. That's not here. There the dog was the racetrack. Here the dog was what the city wanted to do. And this is only the tail. It's a mixed purpose. And you're trying to, it seems to me, to say, well, no, it's only private-private to private. No, then you're ignoring everything else about this project, about everything else the city did, about all the other reasons, about why they have the PMD. What's your reaction to that? Several reactions. Number one, here the dog is Blumberg Chocolate Company. That's the dog here is Blumberg Chocolate Company. So this is an argument over who the dog is. Well, there's no question. That's the dog. Number two. But why is that, though? Because that was, you're saying that it's the dog only because they said that we won't go along with you. So we won't give you our permission. So then they'd have to sue and do something else. That's the dispute that brings us here. Because Sweden, and as it says in Midland Smelting, look to determine who is the primary intended beneficiary of the taking. Not of the overall project, of the taking. And the primary intended beneficiary of the taking here is Blumberg Chocolate. Now, are there incidental public benefits? Yes. No question about it. That's true in every economic development taking. And there are economic development takings all over the city, Your Honor. And the public is an incidental beneficiary. And the public would be here. Blumberg Chocolate stays. We have employment, revenue, et cetera, et cetera. Absolutely. But that's not enough. There would be public benefits from the Sweden taking. I'm sorry. Parking would have avoided people crossing the streets and possibly getting hit by traffic. Unquestionably, look to the primary intended beneficiary. That's the test. You're looking at the purpose. In Sweden, they're looking at the sole purpose there. But not public purpose. Public use. Public purpose is not sufficient. It's only sufficient if you're spending money. Not if you're taking somebody's private property. And somebody asked me once, why is that a distinction? Why is there a different test for public purpose and public use from the expenditure of public funds versus taking a private property? And I believe the answer is because private property is different. And this is one of those protections that we have in our system for private property. All right. Let's now give me your best five minutes, shall we say, on the trial issues. The testimony that was not allowed, that you think should have been allowed, and the limitation, the other issues that you bring up regarding what happened at trial, separate from whether or not it was an appropriate taking under the Constitution. I think we've already discussed most of that, Judge. Clearly, the project influence rule, we should not have tried this case under this restrictive PMD zoning, which was part of the overall project. The jury did hear testimony about the value that it might obtain if that zoning was to be changed, right? That's correct. But they didn't hear the context. And it's almost a sine qua non. You've got to understand, in order to determine what's the reasonable probability of rezoning, and thus the value, you've got to understand the nature and context in which the restrictive zoning was adopted. So they were allowed to hear the figure, but if this were a personal injury case, they weren't allowed to hear the testimony about the nature, the extent, and the duration of the damages, and, you know, how it impacted on the person's life. I think that's correct, but I've never tried a PI case, Judge. No, I've never done an eminent domain, or even. Okay. Well, why don't you wrap up, then. Okay, so then the only other point that I would make is the points about the appraisal testimony, and we've touched on that. And, again, the problem there is that you've got the jury, who certainly appears to be adopting the opinion of an expert witness, who gives a stilted backup opinion, but we're not entitled to explore his real opinion. And we've also got what I consider to be the reversible error of him saying that he had been hired by Mr. Eichner. Yeah, but let's talk about that for a moment. Was that the subject of a motion, eliminated to prevent them from bringing that out? Yes. And what was the court's basis, and did the court strike the testimony? The court did not strike the testimony. It would be stricken. Actually, let me back up on that, Judge, because this has been a while, and I have to remember exactly what I said. If I remember correctly, we did move to strike. I believe the court did strike the testimony of Mr. Eichner's prior employment, but my point is it's like a pink bell. You can't unring the bell. Yeah, right. You can't unring the bell once it's done. And so the final point I would make is the last refuge in every eminent domain case is just trust the verdict. As long as it's within the range of the evidence, no higher than the highest, no lower than the lowest, then it's going to be okay. I think that general rule does not apply here because of what is a clear, mistaken approach by the jury with respect to the values, and I've laid that out in here. For all these reasons, we don't think this case ever should have been allowed to proceed, and for those reasons, we would ask you to reverse the judgment of the circuit court and dismiss the case with prejudice. If you don't agree with that, we ask you to reverse the judgment of the circuit court and remand for a new trial. Okay. Thank you very much. Do you need a break in between or anything, counsel? You're good to go? Okay, fair. You okay? All right. Thanks for your patience. Absolutely, Your Honors. We've covered a lot of ground, though. You've been saying anything for an hour. I'm sorry? You've been saying anything for an hour. Okay. You've been holding the mute button for a long time. I do warn you, I do like the sound of my own voice, so you shouldn't invite that. May it please the court. This court should affirm the jury's award of just compensation for the city's constitutionally permissible taking of Eichner's property. To begin, the city's taking of Eichner's property is for constitutionally proper public purposes. It serves valid public purposes of economic redevelopment, retention of industrial employment and tax base, reduction of land use conflicts, and prevention of life. So the issue is not the purpose, but the use. Well, Your Honor, respectably, SWITA specifically stated that it was not drawing any bright lines regarding public use in the definition of that term. But it did say that there was still a valid distinction depending on the facts of an individual case. That's correct, Your Honor. The constitution is phrased in the term public use, and so the court said that there is a specific meaning to that. But here today, we are not drawing a bright line. The court said we do not need to draw a bright line to conclude here that there is only a private benefit to this taking and not a public one. And for that reason, it set forth no specific definition of what that public use is. So how would we, in this situation, how would you say we should define it? Well, in this situation, we look to the benefit to the public that occurred from this taking. And here there are contrary or in contrast to SWITA, there are clear public benefits to this taking. And those public benefits are what I was just talking about. Well, the benefit to private use, here the benefit to plumbers is to get what they want and stay there. And that doesn't do anything for Mr. Eichner. That's true, Your Honor. But one thing that SWITA also – You're usually taking it from one – you know, taking it from him, one private property to another private property. That's correct, Your Honor. But SWITA also stated that the mere taking of private property and ultimately giving it over to private ownership does not mean that that is an improper taking as long as there was a proper public use or public purpose to begin with. You say public use or public purpose? Well, I think it actually says – if you read SWITA, it actually uses the terms public purpose and public use rather interchangeably. It does say there's a distinction, but it doesn't draw a clear line as to what that distinction is. And what you're saying in this case, and tell me if I'm wrong, is that there are numerous public benefits by the creation of this TIF and this PMD, allowing this manufacturer to remain there and have a mixed-use sort of environment, the public benefits from that. I don't think anybody disagrees with you. But can you articulate any public use as opposed to public benefit? I'm not saying that you say it's required, but can you articulate any public use? By the general public? Yes. Of this property? No, Your Honor, but I would say that there are public benefits beyond the ability to access that property. Public benefits, you know. Right. So that's a term that's not used. Well, that's not – in Midland-Selton, this Court said that that was the ultimate determinative, whether there was a public benefit, who the ultimate beneficiary is. But this Constitution says use. This Constitution does say use, but there's a long tradition of constitutional case law that has looked beyond – I mean, clearly, before SWITA, the rule was that open access by the public is not required for public use. That was the rule. Now, SWITA quoted an older case called Gaylord that had language in it saying that public use in terms of access was required. But as Midland-Selton recognized that there was a long line of cases between SWITA and Gaylord in which the Court cabined in Gaylord and said, no, that's not the test. The Illinois Supreme Court had said that repeatedly throughout its history. And in Midland-Selton, this Court said that by recognizing that private ownership can ultimately be given over as the end result of a taking, that the Court was saying that that's still a rule, that it doesn't have to be. Are you suggesting, then, that despite the language of the Constitution itself, that the case law in this limited regard that interprets the Constitution suggests that it can be an either-or proposition, either public benefit or public use? Is that the city's position here? Our position is that the case law defined public use to be more than just access by the public to the property, and that's clear. And if you – for example, in Kelo, there's a – That doesn't really answer my question without the respect. So my question is, is it the city's position here that the cases that have interpreted the Constitution on public use have suggested that it is an either-or proposition, that you have public benefit or public use? Your Honor, respectfully, I would not define it that way because I believe that the case law before SWITA had defined public use in terms of public benefit, and so it was not an either-or. It was that public use meant some public benefit. It was broader than use by the public. That was the definition. And if you look at, for example, in Kelo, the U.S. Supreme Court actually went through a very detailed discussion of the development of the meaning of that term, public use, and said that state courts and federal courts in the early – in the 19th century in particular had limited public use to access to the public as the definition, but had recognized that that was really not the right distinction to draw, and that as a practical matter it was almost impossible to put into place, and that over time the definition of public use had become broader and had essentially become something akin to public purpose or public benefit. And you believe that Kelo is binding authority in this case that suggests that the court was proper in denying the trampers? Yes, but I also believe that Illinois Supreme Court case law was also consistent with that approach historically to the definition of public use. You say historically, you mean pre-SWITA. That's correct. And I believe that the difficulty of SWITA only arises with the fact that the SWITA court cited that early Gaylord case and that particular language from Gaylord, which this court later on in the middle and southern recognized had been tabbed by later decisions, and that in fact the SWITA court also had said that ultimately private ownership was okay and that that was still a permissible public use if there was public benefit. So there's been no opportunity for the Supreme Court to clarify what they've meant in SWITA? Not in the interim, Your Honor. But I would also point out that as far as Kelo and its effect on this case and how it holds this court, is that when you look at what SWITA did, SWITA drew no distinction between the takings clauses of the U.S. Constitution and the Illinois Constitution. SWITA talked about both, and then it cites Berman and it cites Midkiff to explain what those constitutional provisions mean. It didn't draw a distinction. It didn't say expressly that Illinois is broader. It used Midkiff and Berman in a way to interpret those two clauses in a way that Kelo ultimately rejected and said, no, that's not what Midkiff and Berman mean. And so to the extent that SWITA was relying on Berman and Midkiff and U.S. Supreme Court constitutional law for its holding, then Kelo certainly binds this court to that extent. Do you think that the Illinois Constitution, the clause here on takings, offers more protection to property owners than the United States Constitution? No, respectfully, Your Honor, I don't. On the state, aside from the damages portion of that clause, there's no textual distinction to be made there. I'm certainly unaware of any other precedent aside from SWITA that can be read to say that it's broader in some way. Okay. If motive is an issue regarding whether a taking occurred, what standard of review should we apply in looking at the motive? Do you think it is? Can it be an issue? I think that it's clear that the colleague thinks that it can be. I believe SWITA does appear to say that motive can be considered. Okay. Then if that is the case, then why would it not be appropriate, aside from the constitutionality of the taking? Let's, for this purpose, say it was a constitutional taking. If that's the case, then why wasn't this jury given all of the evidence to determine what the actual motive was? That your colleague would suggest they ought to be able to get all of the intrigue, for lack of a better word, in order to understand that this was a quid pro quo to help one private entity at the financial peril of another private entity. Why weren't they given all the evidence? Well, respectfully, if this Court were to read SWITA as allowing motive to be considered, it still wouldn't change the fact that the determination of the purpose is a question of law for the Court and not for the jury. I mean, that's clear case law. All the case law says that, that that's the question for the Court, not for the jury. But wouldn't the question of motive and the evidence related to motive also animate the issue of the value of the property, when you're talking about rezoning and, you know, changing it from one to another? No. Respectfully, Your Honor, particularly in this case, because all the evidence here shows that the zoning was already proposed and developed long before the acquisition was ever in the picture. The acquisition didn't motivate the zoning here. You're absolutely correct about that, but there's something a little bit different here, I think, and that is that the principal objector to this overall tip and this PMD, Blomers, was a significant objector whose voice was only silenced after they received certain concessions. That may be true, Your Honor, but what the record lacks any evidence of is what would have happened without Blomers. The only issue raised by Blomers is should my property be included in this. There were eight other industrial users who were in that TIF area, all of whom were on board with it, the TIF, the PMD, who were all on board with it and supported it. We're only talking about the land that ultimately was given to Blomers, Mr. Eichner's property. We're not here, you know, with all due respect, talking about the validity of the overall PMD. I mean, the city did that. They came up with the plan, but we're talking about whether or not the taking within it, that was something that was, you know, part of the grease that got this thing done. You know, Blomers, you get this other land, and you get your TIF money, and then they stopped their objection. That was part of what happened here. But the issue is whether there was a rezone probability of rezoning this property. The PMD existed. It was proposed. It was independent of Blomers. Even the city put in evidence of what the value would be if there was a probability of zoning change. So if the jury hears that, how can you just give them, like, this much and not let them understand the context in which that was made? The circuit court allowed both sides to fully explore the history of the PMD and of PMDs general to explain what a PMD is and what the goals were, how it was established. The only piece of evidence that the jury wasn't allowed to hear was evidence directly linking the acquisition of the property to Blomers. That's what they were there to try. They were there to try whether or not, or they were there to try how much the owner was entitled to for this taking that the government embarked upon. So if that's what they're there to try, why were they prevented from hearing the evidence of how Blomers was able to get something for a dollar when they had offered $900,000 for it when your own experts said it was worth $2.5 million? It seems like they were just pigeonholed. You only get this much information. You're not allowed to hear the rest. Well, the circuit court determined the relevance of that information was at best minimal to the issue of reasonable probability of rezoning, giving everything else that came in, and that the prejudice to the city from the jury potentially reacting to the idea that Blomers was being given property, being taken from ICA and given to Blomers, that that would be potentially prejudicial to the city. And obviously that could inflame the passions of the jury against the city to hear that property is being taken from the defendant here and given to the city for a dollar. So it was an evidentiary ruling. I understand. But before the trial occurred, the city's initial position was that none of that evidence would come in, that they wouldn't hear any testimony about the probability of rezoning, right? I'm not sure. I don't remember what the original position was. But I will say that the charges have ruled at that point that reasonable probability of rezoning would come in, that it was an issue for the jury. So it was coming in. The only part of it that wasn't coming in was the one particular piece linking that potentially prejudicial evidence of the purpose of the acquisition itself to the zoning. And the zoning had already been proposed. It was already out there. Blomers and ICA were proposed to be in that zoning from the start. So there was only minimal relevance to that evidence, and there was high potential prejudice. And for that reason, it was within the trial court's discretion to determine when balancing that prejudice versus that minimal relevance that that evidence didn't come in. All right. So my recollection that the city changed its position on whether or not opinion testimony would come in based upon the value of the land, based upon the reasonable probability of rezoning. That was incorrect. The city did not change its position just before trial? What occurred, Your Honor, was the city had witnesses who were always going to testify that there was no reasonable probability of rezoning. The issue was there. Is there going to be a reasonable probability of rezoning or not? And the city's witnesses were always going to testify, the ones that had been disclosed originally. Our position is there's not a reasonable probability. And the court had ruled that that was the way the case was going to be presented to the jury, right? That's correct, Your Honor. But then when you tried the case, even your witnesses testified as to opinion if the rezoning was changed. Only Mr. Thuvenel testified on the theory of a change to the zoning, of a reasonable probability of rezoning. My understanding is that the city called him just for completeness sake because they wanted the jury to hear all of the opinions. There was already an opinion coming in on the other side at a higher value of 5.5 or somewhere over $5 million based on that theory of reasonable probability of rezoning. If Mr. Thuvenel was allowed to give that testimony, why was Mr. Marouse not allowed to testify that he thought it was a reasonable probability that it would be rezoned? Here's one point I would like to clarify. Mr. Marouse could have testified to that if Mr. Eichner had called him. Mr. Eichner was free to call him as a witness. He had disclosed him as a witness. Mr. Eichner said, I'm going to abandon this witness before trial. And the city said, well, if you're going to do that, then we would like to call him. There was a fight about that. And the circuit court said, you know what? I'm going to allow the city to call him. I don't see any unfair prejudice here. I'm going to allow that. So then Mr. Eichner one month later comes into court and says, I have formally abandoned all of Mr. Marouse's opinion. I'm not going to call him. He didn't have to do that. He could have called him if he wanted to get in that other testimony and that opinion. And he freely chose not to. In order to accept that, and I know what you're saying, in order to accept that, we would have to also accept a rather hyper-technical view, number one, of what the scope of the direct examination was. And number two, we would have to accept a representation that the opinion testimony that your colleague wanted to get out was not impeaching of the opinion testimony that you put Mr. Marouse on the witness stand for. Respectfully, I don't believe it requires a hyper-technical definition at all. Because there was one particular opinion that was going to be asked by the city. This is a separate and different opinion. It's not the same opinion. It's a different set of opinions. But he didn't agree with that opinion. He only stated it as a hypothetical. He agreed with that opinion under the condition that there was no reasonable probability of rezoning. And he would act on cross-examination. I'm sorry, Your Honor. I don't mean to talk over you. Go ahead. I apologize. He would act on cross-examination. Do you believe that's an extraordinary assumption? Is that an extraordinary assumption? Yes. And then it was argued to the jury a closing argument by Mr. Eichner. You heard his testimony was based on an extraordinary assumption. So there was no harm from that. There was no prejudice from that. It wasn't just his opinion that it was an extraordinary assumption. It was his opinion that the contrary was true. He was of the opinion that the zoning would likely be changed. Your witnesses, Dart and Gibbons, were disclosed as being of a contrary opinion, right? That's true, Your Honor. But Mr. Eichner still presented two other witnesses who testified that their opinion was also that there was a reasonable probability of rezoning. Why would they not be allowed to get in evidence of this man's opinion that was inconsistent with the opinion and testimony that you put him on the witness stand for? I just don't get that. It wasn't inconsistent. It was a different opinion from the one that he testified to. It was diametrically opposed. It was the opposite. He said, if I assume the hypothetical, it's worth 2.5. But I don't think the hypothetical is true. I think the contrary is true, and it would be worth 3.6 or whatever. And he was free to testify to that other opinion if he had been called on direct by Mr. Eichner. Mr. Eichner could have done that. He chose not to. He knew what the city was going to call or he knew the city was planning to call Mr. Maroos if he abandoned him, and he chose to abandon him. I don't think you can put in a jury trial with an expert witness, I don't think you can put your opponent in a box like that and expect it to be called fair. Respectfully, our opponent put himself in that box. He was an architect of part of it, which allowed you to call this person. But even after he became aware of what was going to happen, he chose to stand by the decision, and at that point it became the circuit court's discretionary decision whether to limit the scope of cross-examination based on direct. That's an issue of discretion. The circuit court decided that that would be beyond the scope of direct and exercised its discretion to limit it. Perhaps the circuit court could have allowed that testimony, and that wouldn't have been an abuse of discretion either. But here it was the circuit court's discretionary decision at that point. The point I'm trying to make is discretionary call. Any cases that support that discretionary call? You know, I believe in one of the cases that we discussed in our brief, one of the cases that cited for the rule regarding the limitation of cross-examination and different opinions, where there's different opinions that are not the same opinion and that being a discretionary decision. I can't imagine that you could ever find this case that says that a witness gives an opinion on direct examination that he doesn't believe is at all likely. And on cross-examination, you can't allow the opponent to say, to get the witness to say, no, I don't believe that's true. In fact, I believe the opposite. If you could cite us a case that says that witness examination could be that restricted on impeaching an expert's opinion, then I would go your way. But you haven't cited it, and I don't think it exists. Well, Your Honor, I think that the very particular fact issue is the problem. But I think that as a general matter, this is clearly a discretionary issue where it's cross-examination. Well, the question is whether it abused discretion. That's correct. We agree with you on the standard of review. We are. That's not the issue. I agree. But the problem here is, again, the witness was not barred from putting in this testimony. This testimony could have come in. It was admissible. But the problem was that the other side didn't call him. Why does it have to be done later when he calls him on direct examination when what is being offered is clearly impeaching of his opinion that you put on in direct examination? Because, respectfully, it was outside the scope of direct examination, which made it within the discretion of the circuit court. You know, how it could be called outside the scope when it's impeaching, I'd like to see a case on that, too, because that doesn't make a lick of sense to me, with all due respect. One of the other issues that your colleague raised as to the fairness of the trial, what about the issue of violation of the order to refrain from soliciting from the witness that he was initially retained by Mr. Eichner? Well, respectfully, Your Honor, to begin, it's clear, and from the circuit court itself, it's clear that the city did not solicit that information, that the witness offered it on his own. Repressions, says the House of Representatives. So what occurred was that there was a ruling. The court said you can't ask directly whether Mr. Eichner or his lawyers formally employed Mr. Maroos. That's out. You can ask everything else you want about the source of this opinion, who he met with, who developed it, all those things. You can say the city didn't pay for it. All that comes in, that's the one thing you can't ask. So the city did not. Before the witness took the stand, and this is all on the record, the city's lawyers went out with Mr. Eichner's counsel and told the witness, this is the ruling. Your prior employment can't come in. I'm going to ask you some questions, but that can't come in. He takes the stand, and the circuit court becomes concerned with some of his answers, that he's going off subject, that he's free-ranging a little bit. So she said, sidebar, I'd like to talk to him and say, Mr. Maroos, please listen to the questions, answer only the questions that are being specifically targeted to avoid violating my rulings. This is all on direct examination? This is all on direct by the city. So then the city continues its examinations, asks all the things that it's allowed to ask about the source of his opinion. Then on cross-examination, there are questions specifically asked about his CV, about his resume, and here's a list of people who have employed you in the past. It goes through that CV. So there's an implication out there that one of these people who have employed you in the past was a source somehow of this opinion. So on redirect, the city's council asks Mr. Eichner, well, you know, none of these people employed you. So you're saying that that question on cross-examination opened the door to soliciting the evidence? No. That's not what I'm saying, Your Honor. I'm not making a door open. I'm not making a door open. I'm just trying to lay the context actually for what occurred, as a matter of the record. So then there were questions, and one of the questions that they asked is, you know, there were a list of corporations that had employed Mr. Eichner that had been brought to the jury's attention, and the question was, no corporation paid for your opinion in this case, right? Of course, following up on all this, of course, that was a proper question within the scope of my ruling, and the witness gave the answer, well, it may have been one of Mr. Eichner's corporations. I'm not sure. Okay. So you say that the record supports then that that was just sort of volunteered by the witness. Absolutely. In an unresponsive fashion, and the court's striking of it cured whatever error occurred. Absolutely, Your Honor. Absolutely. And the court struck it and instructed the jury not to concern itself with the issue of who had employed Mr. Eichner. I'm curious as to whether, to switch back to the constitutionality of the taking, whether it's the city's position that SWIDA is still good law and that we could uphold the taking on the basis of SWIDA. Is that the city's position? Yes, I see no reason to say that SWIDA is not good law, necessarily. I believe that SWIDA simply doesn't stand for the proposition that Mr. Eichner suggests, which is that property can only be taken to give to a private owner if it's blighted and if it will be ultimately open to the public. SWIDA doesn't say that. And I think Midland Smelting says that as well. You would disagree then with the suggestion by your colleague that the ruling of Judge Novak was based basically upon Justice Freeman's dissent in that case. Is that fair to say? No, I don't believe that. I would not agree with that, Your Honor. I think that Judge Novak's decision is consistent with SWIDA for the same reason that Midland Smelting is, and if this court were to uphold this case under SWIDA, it would be consistent with that as well. I don't think you need to go to the dissent of Justice Freeman's dissent in order to get there. Let me ask you a specific question about the Midland case, and I think I'll be done with you. How do you read the following quote from Midland, and how would you analyze its application to this particular case? This is Justice McBride's opinion. This case should therefore not be viewed in the context of a typical taking of private property by the government in order to give that property to another private enterprise. To do so would be to view this case too narrowly and to ignore its unique nature. Well, okay. I believe there were several different issues going on in that case. One of them was the public purpose put forth in that case was a substitute condemnation, so that made it unique and different from SWIDA. So that was one ground for distinguishing it from SWIDA and from what SWIDA said, but in doing that, the court also expressly addressed what does SWIDA mean on this public use issue and expressly addressed an argument made very similar to Mr. Eichner's that public use requires access to public property, and said that on that issue, that's not what SWIDA says. So although the court did distinguish on the basis of the substitute condemnation, that's not the basis for its distinction on the public use. But didn't it also make its ruling narrowly, as it suggested in that sentence there, because the factual circumstances of that substitute condemnation case was that there was – it had already been decided that it was an appropriate taking before, and there was just one aspect of it that popped up later that required the substitute condemnation. Isn't that case just so narrowly construed as to its facts as to be inapplicable here? Respectfully, no. I think if you look at SWIDA, you'll see that SWIDA quotes Berman, the U.S. Supreme Court case, for the idea that all these cases have to be decided on a case-by-case basis. And for that reason, I think that's one of the reasons, of course, that we're not drawing a broad line. For that reason, you're going to find different facts in all these different cases. That doesn't mean that they're not applicable just because they had different facts. And again, the important thing is that regardless of the facts, and setting aside the purpose in Midland-Spelting, the Midland-Spelting specifically addressed this issue of what does public use mean under SWIDA and rejected virtually an identical argument to the one that ICAR is making here. How do you take this quote from SWIDA? Quote, whether SWIDA exceeded the boundaries of constitutional principles and its authority by transferring the property to a private party for a profit when the property is not put to a public use. Was that not the issue in SWIDA? I believe that's the ultimate determining issue. The court just saw these facts as so far afield from what could possibly be considered proper under the Constitution, that that's what really turned the case. It was the facts of that case. It wasn't the legal definition of public use. The court said, I don't need to reach a bright line because clearly there's no public benefit here. And SWIDA did specifically say that it would be justified to take slums and blight for the purpose of clearance and redevelopment regardless of the subsequent use of the property, right? Absolutely. But didn't find any such purpose in that particular fact scenario. That's exactly right. The court said that, but because that's not before this court, those cases really have nothing to say to inform us. Isn't that the same situation that Mr. Eichner finds himself in? No. There's no slum. There's no blight. He's in a conservation area. Isn't that the same? Respectfully, it's distinguishable for several reasons. One, just because the SWIDA court said that takings to eliminate blight are one permissible public purpose doesn't mean that it's the only one. And the court certainly never goes anywhere near that in SWIDA. And two, here there are multiple public benefits and purposes to this taking beyond just the profit of the private company, which is what the problem that the court saw in SWIDA was that it was really just to profit. But the public purpose that you're talking about is not to get rid of blight or potential blight. It's to maintain manufacturing surrounded by the residential. Well, I believe that. Nickel use. Preventing blight is one of the purposes. And you'll see that in creating the TIF redevelopment project area, the city's Department of Planning actually did have a study done that found three blighting factors under the TIF Act present which qualified the area as a conservation area, which means that there is a risk of future blight under the statute. And so, therefore, by taking you'll see in the ordinance, the city council said that this will allow us to fund projects to redevelop underused and underutilized property in this area to prevent blight. And that's what's happening here. You have taken an underutilized property, which will now be used with new investment and new industrial uses exactly to further those purposes. And so even though it may not be the elimination of current blight, there's certainly under the TIF Act an allowance to protect conservation areas from further blight. And in light of the fact that we were dealing with a teenager here, you know, in terms of the litigation history, we have the benefit of retrospective vision to look back at what this plan was and what ultimately occurred here. And now this neighborhood does have two additional towers of very high-end residential rental apartment buildings, right? Not within the PMD. No, just on the periphery of the PMD. Within the periphery of the PMD. The Kinji project went up. And on Kinji and then K2 over Fulton, north of Fulton. Yes, but again, one of the purposes of this whole project, and you'll see this, it's very clear in the record from the outset, was to make this whole area work for everyone. Because all the men were testifying at these hearings and these public meetings, that they were hearing lots of land use conflict problems. The manufacturers were having problems and the residents were having problems. So setting this all up means that there was a way to create a buffer area that makes sure manufacturers are not going to have any more incursion from residential into your area. And residential, you know you're going to have a certain buffer around you. And in particular, the acquisition of this particular property was specifically for that reason. Blomers was saying, look, we don't want to be included here because we think we're going to have problems with the neighbors if we're on the very edge of this. And so they worked with, this is something I would like to point out, it wasn't just Blomers and the city, it was also the developer across the street who came in and they all worked together. And so the developer said, well, we'll put up green space as part of this and we'll put a buffer here. And then Blomers said, well, we'll help us enclose our area and bring more of our traffic, our trucks and our employees off the street because we get a lot of complaints from the neighbors about traffic and noise. And so all of this was a way for everyone to make this whole area work for everyone. The Blomers' benefit in staying was substantially enhanced, would you agree, by the fact that they got $20 million in TIF money and they got this piece of land which they had offered almost $900,000 for, for a dollar. That's true, but I don't think that the fact that a private party also benefits from something that serves the public in any way affects the constitutionality, unless that's the primary beneficiary, which is what you'll see in Swinane and the buildings. Okay. What's your response to Council's comments about the project influence rule? Project influence rule, you know, can I take this a few pieces at a time? There is a statute that says, you know, the effect of a public improvement on the value of property when you have it taken can't be considered. Then there's a different rule that says that when there's evidence of down zoning to change the value of that property, lower it so the city gets it cheaper, you can't consider that either. But those are two different rules, and respectfully, my opponents tried to merge those into one. The zoning here isn't the project for which the property was acquired. Yes, the zoning plays into all those background purposes for the constitutional purposes. That's what he quotes back from our brief. But the project, there was a redevelopment project pursuant to the TIF Act here that statutorily allowed the city to be authorized to take this property. And as part of that, there was a redevelopment agreement given to Blomers to allow it to redevelop this area. And as part of that redevelopment project, this property was taken for Blomers' purposes. That's not what is being argued should not be allowed in under this project influence rule. It's the zoning. And the fact is, the only law on zoning is if there's down zoning to lower the acquisition cost, that doesn't come in. But there is simply zero evidence of that presented anywhere. That's exactly right. Okay. Unless there are further questions, we would ask that this court affirm. Thank you. Thank you very much. Well done. Rebuttal. Thank you, Your Honor, just very briefly. I listened with quite curiosity to counsel's explanation of the course of the examination with respect to Mr. Eichner and the previous employment of Mr. Maroos. I would refer, Your Honors, to the record citations on page 44 of our brief. I would certainly, and I have argued that this didn't just get innocently blurted out. This was an attempt by the city through innuendo to suggest that, in fact, Mr. Eichner had been the previous employer of Mr. Maroos. They got more than they asked for. They tried to draw a very fine line, and eventually he blurted it out. That's what they were trying to elicit that resulted in. That Mr. Eichner had previously employed Maroos. They were trying to say, and take a look at these citations and also on page 9, where they argued in closing argument and essentially attempted to tell the jury, look, Maroos is Eichner's guy, and if Maroos says it's two and a half. Tell me essentially what they said in closing argument. What did they say? I don't know that I have the exact quotation, Your Honor. I would simply. Well, we can look at it. Right. I would simply refer you to pages 9 and 44 of my brief for the transcript citations. Second, the only other thing I wanted to point out is in the discussion of hero, public purpose, and public use, the question was asked whether it's either or. And the answer came that there's a long tradition of case law that it's either or. And I think that you need to look at that very carefully, because the tradition of either or comes primarily from federal cases, Berman v. Parker, Hawaii Midkiff, and a series of state cases that have followed that, the Kelo case in Connecticut and the Connecticut Supreme Court being a primary example of that. In contrast, in the Suida decision itself, it quotes first People v. City of Chicago. Before the right of eminent domain may be exercised, the law beyond a doubt requires that the use for which the land is taken shall be public, as distinguished from a private use. And then the court goes on in the same decision and quotes the Gaylord case. The public must be to some extent entitled to use or enjoy the property, not as a mere favor or by permission of the owner, but by right. So the distinction has been strong in Illinois in the state cases, saying that while for the expenditure of money you are required to show public purpose, for the taking of private land you are required to show something more, and that is private use. For the reasons we've stated, if there are no other questions, Your Honor, we respectfully request you to reverse and either dismiss this case with prejudice or order a new trial. Okay. I'd like to thank both sides for a great job in briefing what are complicated and somewhat arcane issues and had great presentations today. It's helping us a lot, I think, in our resolution of the case. We will make sure that Justice Kuczynski listens to the tapes and that the three of us will then come back with an opinion directly. Okay. We're adjourned. Thank you, Your Honor.